**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT ASHLAND**

**CIVIL ACTION NO. 07-27-DLB**

**RENA PURINTUN SWANSON**                                              **PLAINTIFF**


**vs.**                               **MEMORANDUM OPINION & ORDER**


**RHONDA RENEE PURINTUN WILSON, ET AL.**                **DEFENDANTS**

*        *        *        *        *        *        *

Plaintiff Rena Swanson commenced this action against her mother, Rhonda Wilson; her step-father, Kim Wilson; and various corporate entities to recover her share of the proceeds from the settlement of a lawsuit related to her father's accidental death. Plaintiff alleges that her mother was a fiduciary and breached the duties she owed to Plaintiff by concealing the existence of the settlement proceeds belonging to Plaintiff, and by using fraudulent means to gain access to Plaintiff's funds for her own use and benefit.

This matter is currently before the Court on Defendants' Motion for Summary Judgment (Doc. #93) and Plaintiff's Motion for Partial Summary Judgment (Doc. #91). Both motions have been fully briefed (Docs. #101, 102, 106, 107) and the matter is now ripe for review. For the reasons set forth below, because Plaintiff's claims are time-barred by the applicable statutes of limitations, Defendants' Motion for Summary Judgment (Doc. #93) is **GRANTED**, and Plaintiff's Motion for Partial Summary Judgment (Doc. #91) is **DENIED AS MOOT**.

1

## I.    FACTUAL AND PROCEDURAL BACKGROUND

This case has its genesis in tragedy.  In 1983, Leroy Purintun, a welder, was killed in an oil tank explosion.  Following the accident, his wife Rhonda brought a wrongful death action in Illinois state court as administrator of Leroy's estate, and on behalf of her minor children, Rena and Melissa.  The case was settled in 1990; at the time of settlement, Rena was nine years old.

Rena's claims were settled for $234,375.00.  Defendants agreed to pay $109,375.00 immediately upon settlement with the funds distributed as follows: $95,792.99 to pay litigation costs and attorney's fees, $1,193.30 to pay estate costs and fees, and the remaining $12,388.71 to be used to open a restricted bank account in Rena's name where her portion of the immediate settlement proceeds and any future payments would be deposited and held until she attained majority, or the Probate Court ordered the funds be released.

The settlement agreement also provided that Safeco Insurance Company of America ("Safeco"), the liability insurer of the defendants in the wrongful death suit, would make periodic payments to Rena.  Safeco agreed to pay Rena $300 monthly until she reached the age of 18, with a guaranteed interest rate of 6% compounded annually.  In addition, Safeco agreed to make nine large lump-sum payments totaling $248,000, to be periodically paid to Rena between her 18th and 22nd birthdays.

As part of the settlement, Safeco made a qualified assignment of its payment obligation to Symetra Assigned Benefits Service Company.  To fund the payments, Symetra entered into an $125,000.00 annuity contract with Symetra Life Insurance Company ("Symetra Life").  In addition, Safeco also issued a surety bond under which it

promised to make the settlement payments to Rena if Symetra failed to perform its obligations under the qualified assignment.

In order to facilitate the creation of the restricted account and the deposit of the first settlement payment, the Probate Court appointed Rhonda the guardian of Rena's estate. Defendant Capitol Indemnity Corporation obligated itself on Rhonda's fiduciary bond.  On December 31, 1990, Rhonda opened an account in Rena's name at American National Bank and Trust Company of Chicago ("American National Bank")[1] and deposited $12,388.71.  That same day, following Rhonda's production of documents to the Probate Court establishing that the balance of Rena's estate had been deposited into her restricted bank account, the Probate Court closed Rena's estate, discharged Rhonda from further duty as guardian of the estate, and released Capitol from further obligation.

In the years following the settlement, Symetra Life deposited all of the scheduled monthly payments, and the first guaranteed lump-sum payment directly into Rena's restricted bank account.

In early 1995, Rhonda and Rena moved to Tustin, California.  In March of that year, Rhonda met Kim Wilson on-line through AOL.  The two corresponded electronically for several months before meeting in-person, and eventually marrying on December 21, 1995. In 1996, Rhonda, Kim, and Rena moved to 8500 Todd Court, Riverside, California.  Rena turned 18 on September 28, 1998.

A few weeks later, in early October 1998, Rena and Rhonda had an argument which culminated in Rhonda kicking Rena out of her house.  After sleeping in a friend's car for a

---

[1] JPMorgan Chase Bank, N.A. is the successor in interest to American National Bank and Trust Company of Chicago.

few days, Rena flew to Guam to be with her boyfriend Robert, who was in the Navy and stationed there.  Rena and Robert were married on December 2, 1998, and their first daughter was born on July 22, 1999.

Rena remained in Guam for less than a year.  She and Robert returned to the United States with their newborn daughter in late August 1999, following Robert's discharge from the Navy.  Upon her return, Rena and her family lived with Rhonda and Kim in the house on Todd Court.  Once Robert found a job, Rena and her family moved out of Rhonda's house and into an apartment in Orange County.  Prior to Rena's move, Rhonda induced her daughter to sign a Durable Power of Attorney which empowered Rhonda to act on Rena's behalf with respect to various matters, including banking transactions.

In early November 1999, American National Bank received a letter, purportedly signed by Rena, which states:

> I, Rena S. Purintun have reached the age of maturity and would like all of my funds released, including the CD deposit.  I have enclosed all of the documents you require.  Please send the check promptly.

(Doc. #101, ex. 6).  Enclosed with the letter was: a certified copy of Rena's birth certificate, a photocopy of Rena's California identification card, and a photocopy of Rena's Social Security card.  The return address on the letter was 8500 Todd Court.  On November 9, 1999, pursuant to the letter of instruction purportedly from Rena, American National Bank closed the restricted account and issues two cashier's checks, made payable to Rena, for a total of $67,957.05.  Both checks were apparently cashed on November 17, 1999; however, it remains unclear who cashed the checks, or at what bank the checks were presented, as American National Bank no longer maintains records which would reflect either fact.

On December 19, 2000, Symetra Life received a letter, allegedly signed by Rena,

stating:

> Per phone conversation, I am sending my notarized signature and SSI#xxx-
> xx-xxxx.
>
> Please forward all of the payments you are holding on my Annuity Contract
> . . . to my above address.

(Doc. #93, ex. D).   The return address on the letter was 8500 Todd Court, the house

belonging to Rhonda and Kim, in which Rena and her family had not lived for over a year.

As the letter was accompanied by a California All-Purpose Acknowledgment completed by

a notary public and verifying Rena's signature, Symetra Life honored the letter's request,

and sent any checks it was holding, and all future checks, to Rhonda's address.

In early 2001, Rena's husband lost his job, and he and Rena resolved to move with

their two daughters to Georgia to be near Robert's mother.   On March 2, 2001, just prior

to Rena's move to Georgia, Rhonda and Rena opened a joint bank account with Bank of

America.   Rhonda persuaded Rena to open the account by telling her that she would

periodically place money in the account which would be used to help pay Rena's living

expenses, and serve as a source of emergency funds for Rena and her family.   Although

the first of the lump-sum checks mailed to 8500 Todd Court by Symetra Life was cashed

at a Bank of America branch, all of the remaining checks were deposited into Rena and

Rhonda's joint account.   Each check was purportedly endorsed by "Rena S. Purintun," with

a few of the checks also bearing the endorsement of "Rhonda Renee Wilson."

As neither Rena nor Robert was able to find employment, they stayed in Georgia

only six months.   In September 2001, they moved to Minnesota, to live with Robert's father.

Robert found work, so Rena and her family remained in Minnesota, where Rena eventually

gave birth to a third daughter.   However, given Robert's poor credit and money management skills, Rena and her family often had trouble securing and maintaining housing, and were frequently in need of money.

In April 2002, while visiting her older sister Melissa in Wisconsin, Rena learned that she might be entitled to receive some money in connection with their father's accidental death.  Specifically, Melissa revealed that she had received a sizeable sum of money in connection with a lawsuit, and that Rena had a right to receive a similarly large sum of money from their mother, Rhonda.  Following her conversation with Melissa, Rena asked Rhonda about the money and was told that Melissa lied about the prospect of Rena receiving any money in connection with her father's death.  Rhonda claimed that Melissa had fabricated the entire story about the settlement in order to interfere with Rhonda and Rena's close relationship.  Rena apparently believed Rhonda's explanation, for she did not contact Melissa again, nor did she speak to anyone else about the settlement money.

In October 2002, with their apartment lease about to end, Robert and Rena decided to purchase a house, and asked Rhonda assist them in making a down payment.  Rhonda refused.  Desperate, and afraid that her family may be without a place to live if they were unable to purchase a home, Rena remembered the joint bank account opened in 2001 and called Bank of America to learn to account's balance.  Rena was told that the account contained $62,520.71.

In addition to providing the balance of the joint account, Bank of America also disclosed to Rena that the source of the funds in the account was an annuity company in Washington, and that all the money in the account had come from checks that bore her name.

6

On December 3, 2002, Symetra received a notarized letter from Rena which read: "I have not received, deposited, or cashed any checks from Safeco Insurance.  I first became aware that checks issued to my name from Safeco Insurance were being signed, deposited, and withdrawn on 11/29/2002." (Doc. #101, ex. 8).  In response, Symetra faxed two letters to Rena which detailed all of the payments made to Rena's restricted minor's account, and all of the checks issued in her name and mailed to 8500 Todd Court.  In addition, Safeco attached to the second letter copies of the settlement agreement and the last three settlement checks deposited into the joint account.  Immediately upon receiving the first letter from Safeco, Rena opened an individual bank account with Bank of America and transferred into it the balance of the joint account.

In February 2003, Rena and Robert purchased a house in Solon Springs, Minnesota, and in April of that year, Rena gave birth to a fourth daughter.  In June 2003, Rhonda and Kim left California, moving to Morehead, Kentucky.  Shortly after the Wilsons' move, Rena called Rhonda and Kim, demanding they provide an explanation regarding the existence and location of her settlement money.  Rhonda and Kim denied the existence of any settlement money belonging to Rena or any wrongdoing.

In July 2003, Rena sent to Safeco affidavits which stated that the signatures on the lump-sum checks issued in her name were "forgeries."  In addition, through a letter dated July 21, 2003, Rena requested that Safeco send to her all information regarding her annuity account, including the routing and account numbers for the restricted account with American National Bank.  In the letter Rena stated: "I need these numbers to inquire about this account as it may have been taken by my mother in the same fashion as the checks made payable to me from Safeco."  (Doc. #101, ex. 12).

Rena contacted American National Bank on July 22, 2003, and was informed that her restricted bank account had been emptied in 1999.  Rena denied sending the notarized letter authorizing the closing of the restricted account and requested American National Bank to send to her all bank statements for the restricted account.  Rena received those bank records on August 25, 2003.

On October 29, 2003, Rena filed a Motion for Accounting before the Circuit Court of Cook County Probate Division.  (Doc. #93, ex. 6).  In her motion, Rena alleged that Rhonda had not only concealed the existence of the settlement proceeds intended for Rena, but had forged Rena's signature on various checks and letters in order to gain control of, and use for her own benefit, money intended for Rena.  The record does not indicate the whether and/or how the Probate Court ruled on this motion.

Rena filed the instant action on March 9, 2007.  In the Complaint, Rena repeats the allegations against Rhonda contained in her Motion for Accounting, and adds claims against Kim Wilson, JPMorgan Chase & Company[2], Capitol Indemnity Corporation, Safeco, Symetra, and Symetra Life.  (Doc. #1).  Plaintiff subsequently settled her claims against JPMorgan Chase, Safeco, Symetra, and Symetra Life.  (Doc. #118, 128).  Therefore, the only claims remaining before the Court are those against 1) Rhonda, for an accounting (Count I), breach of fiduciary duty and/or constructive fraud (Count II), conversion (Count III), and fraud (Count IV); 2) Kim, for conversion (Count III), and aiding and abetting fraud (Count IV); and 3) Capitol Indemnity Corporation, for indemnification of Rhonda (Count VII).

---

[2] Upon agreement, and based upon the representation of the JP Morgan Chase entities that JPMorgan Chase Bank N.A. was the proper successor in interest to American National Bank and Trust Company of Chicago, JPMorgan Chase Bank, N.A. was substituted as Defendant for JPMorgan Chase & Company.  (Doc. #26).

Rena seeks injunctive relief, compensatory damages, pre- and post-judgment interest on all sums due, attorney's fees, and costs of suit.

## II.    ANALYSIS

### A.    Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is not a genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In deciding a motion for summary judgment, the court must view the evidence, and draw all reasonable inferences, in favor of the moving party."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"The moving party bears the burden of showing the absence of any genuine issues of material fact."  *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008).  Once the movant has satisfied its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), it must produce evidence showing that a genuine issue remains, *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000).  If, after reviewing the record as a whole, a rational fact finder could not find for the nonmoving party, summary judgment should be granted.  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

Where, as here, a defendant moves for summary judgment based on statute-of-limitations grounds, this Court must determine whether: 1) the statute of limitations has run, and 2) whether there exists a genuine issue of material fact as to when the plaintiff's cause

of action accrued.  *Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001).  "Because the statute of limitations is an affirmative defense, the burden is on the defendant to show that the statute of limitations has run."  *Id.*  If the defendant carries this burden, then the plaintiff must establish an exception to the statue of limitations, such as a tolling of the statute or late discovery of the injury.  *Id.* (citing *Drazen v. United States*, 762 F.2d 56, 60 (7th Cir. 1985)).

**B.    Statutes of Limitations**

Defendants contend summary judgment is proper because all of Plaintiff's claims are time-barred by the applicable statutes of limitations.  Specifically, Defendants assert that pursuant to Kentucky's "borrowing statute", Ky. Rev. Stat. § 413.320, Plaintiff's causes of action accrued in California, in which case California's three-year statute of limitations, Cal. Civ. Proc. Code § 338(d), bars her breach of fiduciary duty and fraud claims, and Kentucky's two-year statute of limitations, Ky. Rev. Stat. § 413.125, bars her conversion claim.  Plaintiff not only disputes Defendants' assertion that her cause of action accrued in California, but also takes issue with which statutes of limitations - whether from California or Kentucky - apply to her claims.

Plaintiff argues that her cause of action "arose" in Illinois; therefore, as both Illinois and Kentucky grant plaintiffs five years to sue for breach of fiduciary duty, all of her claims would be governed by Kentucky Revised Statutes § 413.120(7).  However, in the alternative, Plaintiff asserts that, even if her cause of action accrued in California, it is timely as all of her claims fall under California's four-year statute of limitations, Cal. Civ. Proc. Code § 343.  Therefore, in order to ascertain whether Plaintiff's action is timely the Court must determine not only where and when Plaintiff's cause of action accrued, but which

statutes of limitations apply to each of her claims.

### 1.    Kentucky's Borrowing Statute

The Court, sitting in diversity, must apply the procedural law of the forum - Kentucky

- including its statutes of limitations.  *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577 (6th Cir.

2004); *Elec. Power Bd. of Chattanooga v. Monsanto Co.*, 879 F.2d 1368, 1375 (6th Cir.

1989).   Included in Chapter 413 of the Kentucky Revised Statutes, which governs the

limitation of actions in Kentucky, is Kentucky's "borrowing statute."   *See* Ky. Rev. Stat. §

413.320.

Although officially titled "Cause of action barred here if barred where it accrued,"

Section 413.320 is termed a "borrowing statute" because, when applicable, it "borrows" the

limitations period of the state wherein an action accrued, if that period is shorter than the

period of limitation prescribed by Kentucky law:

> When a cause of action has arisen in another state or country, and by the
> laws of this state or country where the cause of action accrued the time for
> the commencement of an action thereon is limited to a shorter period of time
> than the period of limitation prescribed by the laws of this state for a like
> cause of action, then said action shall be barred in this state at the expiration
> of said shorter period.

Ky. Rev. Stat. § 413.320.   This Court is bound by the Sixth Circuit Court of Appeals'

interpretation of Section 413.320.  *Atkins v. Schmutz Mfg. Co.*, 372 F.2d 762, 763 (6th Cir.

1967).   In *Willits v. Peabody Coal Co.*, Nos. 98-5458, 98-5527, 1999 WL 701916, at *12

(6th Cir. Sept. 1, 1999), the Sixth Circuit set forth a three-step analysis for determining the

applicability of Kentucky's borrowing statute: 1) whether the cause of action accrued in

another state; 2) if the cause of action did accrue in another state, whether that state's

statute for limitations for the particular cause of action is shorter than the corresponding

Kentucky statute of limitations; and 3) if the accrual state's statute of limitations is shorter than Kentucky's, then the statute of limitation of the accrual state is applied; but if the statute of limitations for the cause of action in the accrual state is longer than Kentucky's, then Kentucky's statute of limitations is applied.  *Willits*, 1999 WL 701916, at *12; *see Combs*, 354 F.3d at 593.  Thus, the key factor in the analysis is where the cause of action accrued.  *Combs v. Int'l Ins. Co.*, 163 F. Supp. 2d 686, 691 (E.D. Ky. 2001).

### 2.    Place of Accrual

In determining where Plaintiff's cause of action accrued, this Court applies Kentucky law.  *See Willits*, 1999 WL 701916, at *12 (citing *Cope v. Anderson*, 331 U.S. 461, 466-67 (1947) (applying the law of the state of the borrowing statute to determine where a cause of action accrued)).  However, in considering the question currently before the Court, the Sixth Circuit has noted "there is little or no law in Kentucky concerning where a . . . [cause of] action accrues." *Combs*, 354 F.3d at 593 (quoting *Willits*, 1999 WL 701916, at *12).

Unlike tort cases involving an injury to a person or property in which the cause of action accrues in the state where the injury was sustained, "the notion that the cause of action accrues where the injury is sustained is not particularly helpful in this case because it begs the question where plaintiff sustained the injury." *Combs*, 354 F.3d at 582.  This action involves a purely economic injury with connections to several states - funds located in an account in Illinois and annuity checks from a Washington company were allegedly fraudulently diverted to California by one of the Defendants, to the detriment of Plaintiff who lived in California, Georgia, and Minnesota during the time period in which the thefts occurred - consequently, asking where Plaintiff "got hurt" does not help the Court decide where her causes of action accrued.  *See Id.*

12

Perhaps in acknowledgment of the uncertainty surrounding the situs of her injury, Plaintiff contends that Illinois is the "logical choice" for where her action accrued "as that is where the relationships are all rooted and where the money was located for many years by court order." (Doc. #101 at 27). In essence, Plaintiff is urging the Court to look to which state has the"most significant relationship" to the case to determine the place of accrual. What Plaintiff fails to realize, however, is that, in *Combs v. Int'l Ins. Co.*, 354 F.3d 568 (6th Cir. 2004), the Sixth Circuit expressly rejected the proposition that Kentucky would employ a "most significant relationship" analysis when applying Kentucky's borrowing statute. *Id.* at 592, 597 ("[W]e conclude that the Kentucky Supreme Court would apply the borrowing statute by focusing only on where the cause of action accrued, not on which state has the greatest interest in the dispute.").

Rather, in cases such as this where the location of accrual is not readily apparent, the Sixth Circuit - following Kentucky courts - has looked to *when* a cause of action accrued to determine the place of accrual:

> The time when a cause of action arises and the place where it arises are necessarily connected, since the same act is the critical event in each instance. The final act which transforms the liability into a cause of action necessarily has both aspects of time and place. It occurs at a certain time and in a certain geographical spot.

*Willits*, 1999 WL 701916, at *12 (quoting *Helmers v. Anderson*, 156 F.2d 47, 51 (6th Cir. 1946)). For example, in *Willits v. Peabody Coal Co.*, Nos. 98-5458, 98-5527, 1999 WL 701916, at *13-14 (6th Cir. 1999), the Sixth Circuit, applying Kentucky law, undertook to determine the place of accrual in an action involving a single defendant which had miscalculated royalty payments and mailed them to many individuals "in their various states of residence." Emphasizing that "all of the alleged wrongful conduct occurred at the

13

[defendant's] offices in Missouri, the Sixth Circuit concluded that the cause of action accrued in Missouri - when and where the defendant had made the miscalculations - rather than wherever each plaintiff happened to receive his or her deficient check  *Id.*

Applying these principles to the facts of the instant case, the Court concludes that Plaintiff's causes of action accrued in California.  All of the allegedly wrongful conduct that forms the basis of Plaintiff's claims was performed in California: 1) the preparation and transmittal of the letters to American National Bank and Symetra Life requesting Rena's funds be sent to 8500 Todd Court; (2) the opening of the joint bank account with Bank of America; (3) the forged endorsement and deposit of Rena's checks; and (4) the partial dissipation of Rena's funds by Rhonda and Kim.  Therefore, like in *Willits*, Plaintiff's causes of action accrued in California, where (and when) Rhonda and Kim performed all of the actions which constitute the alleged theft of Plaintiff's settlement money.  *See McMurtry v. Botts*, No. 1:04-cv-81-R, 2005 WL 2429109, at *7 (W.D. Ky. Sept. 30, 2005) (applying Kentucky's borrowing statute and concluding that "all of [defendant's] actions occurred in Tennessee; therefore, for choice of law purposes, the claims all accrued in Tennessee").

### 3.   Date of Accrual

Both Kentucky and California courts recognize and apply the "discovery rule" to toll the statute of limitations in cases where a plaintiff is unaware of the existence of his or her cause of action due to concealment by another.  *Jolly v. Eli Lilly & Co.*, 751 P.2d 923, 928 (Cal. 1988) ("Under the discovery rule, the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something to her."); *McLain v. Dana Corp.*, 16 S.W.3d 320, 326 (Ky. Ct. App. 1999) ("Under Kentucky law, the discovery rule provides that a cause of action

14

accrues when the injury is, or should have been, discovered." (citing *Michels v. Sklavos*, 869 S.W.2d 728, 732 (Ky. 1994))).

All parties acknowledge the applicability of the discovery rule to the instant case; however, they disagree as to when the limitations period began to run.  Defendants argue that Plaintiff had actual knowledge of the fraud no later than November 29, 2002 - the date, identified in her notarized letter to Symetra, on which Plaintiff claims she first became aware that annuity checks in her name were being signed, deposited, and withdrawn. (Doc. #101, ex. 8).  Plaintiff counters that the statute did not begin to run until much later - June 2003 - when she confronted Rhonda and Kim regarding the location of her settlement funds, and they offered no explanation for what had happened to the money.  Plaintiff argues that although she may have been aware on November 29, 2002, that annuity checks in her name were being diverted, she was not aware that the funds had been stolen by her mother and step-father until summer 2003.

Plaintiff's argument, however, fails to appreciate that - in California and Kentucky - the limitations period begins to run under the discovery rule, not when the plaintiff has actual knowledge of all the essential elements of her claims, but when she has been put on notice that she may have been injured. *Mangini v. Aerojet-General Corp.*, 281 Cal. Rptr. 827, 843 (Cal. Ct. App. 1991) ("The limitations period begins once the plaintiff has notice or information of circumstances to put a reasonable person on inquiry.  Subjective suspicion is not required.  If a person becomes aware of facts which would make a reasonably prudent person suspicious, he or she has a duty to investigate further and is charged with knowledge of matters which would have been revealed by such an investigation."); *McLain*, 16 S.W.3d at 326 ("A person who has knowledge of an injury is

put on 'notice to investigate' and discover, within the statutory time constraints, the identity of the tortfeasor.").

Plaintiff's letter to Symetra establishes that, no later than November 29, 2002, Plaintiff had knowledge of sufficient facts to put her on notice that funds had been stolen from her, thereby triggering her obligation to investigate further in order to determine the extent and cause of her injury.[3]  In addition, by this date, Plaintiff was also aware that Rhonda was most likely the person who had diverted her checks.  Seven months earlier, in April 2002,  Plaintiff's sister Melissa had informed her that she may be entitled to receive a large sum of money from the settlement of their father's wrongful death action, and had suggested Plaintiff talk to Rhonda about receiving her share.  It is immaterial that, at the time Plaintiff wrote to Symetra, she may have been holding out hope that Rhonda had safely deposited Plaintiff's money in an unknown account, or invested the funds for her benefit.  The statutes began to run, not when Plaintiff was subjectively aware that Rhonda had stolen and spent her money, but when Plaintiff possessed sufficient facts to alert her that she had been injured.

Because Plaintiff's own letter establishes the date on which she first discovered her injury, there exists no genuine issue of material fact as to when Plaintiff causes of action accrued.  Accordingly, the statutes of limitations began to run on all of Plaintiff's causes of action on November 29, 2002.

---

[3] Plaintiff offers no explanation why, after finding out about the diversion of the checks in November 2002, she waited over six months to confront Rhonda and Kim about the existence and location of her settlement money.

#### 4.    Applicable Statutes of Limitations

The parties disagree as to which statutes of limitations apply to Plaintiff's various causes of action.  Kentucky applies a five-year limitations period to breach of fiduciary duty claims.  Ky. Rev. Stat. § 413.120(7) ("The following actions shall be commenced within five (5) years after the cause of action accrued . . . [a]n action for an injury to the rights of the plaintiff, not arising on contract and not otherwise enumerated.").  Accordingly, Plaintiff contends that, under the borrowing statute, California's four-year limitations period - applicable to both accounting actions and actions for breach of fiduciary duty - should apply to all of her claims.  *See*  Cal. Civ. Proc. Code § 343 ("An action for relief not hereinbefore provided must be commenced within four years after the cause of action shall have accrued.).

Defendants contest the existence of a fiduciary relationship between Rhonda and Rena, and argue that Rena's breach of fiduciary duty and fraud claims (Counts I, II and IV) are governed by California's three-year statute of limitations for "an action for relief on the ground of fraud or mistake."  Cal. Civ. Proc. Code § 338(d).  In addition, Defendants argue that, by operation of the borrowing statute, Kentucky's two-year limitations period - rather than California's three-year statute - applies to Plaintiff's conversion claim.  *See* Cal Civ. Proc. Code § 338(c) ("Within three years . . . [a]n action for taking, detaining, or injuring any goods or chattels, including actions for the specific recovery of personal property."); Ky. Rev. Stat. § 413.125 ("An action for the taking, detaining or injuring of personal property, including an action for specific recovery shall be commenced within two (2) years from the time the cause of action accrued.").

The Court, however, need not determine which statutes apply to Plaintiff's various

17

causes of action; no matter which statute is applied, Plaintiff's claims are time-barred.  As discussed above, the limitations period began to run on plaintiff claims on November 29, 2002.  Plaintiff did not file the instant suit until March 9, 2007 - four years, three months, and ten days after her cause of action accrued.  Consequently, even if the Court were to agree with Plaintiff and apply California's four-year statute of limitations to all her claims, the action would still be untimely.

Therefore, because Plaintiff failed to file the instant action before any of the applicable statutes of limitations had run, her claims must be dismissed, and Defendants are entitled to judgment as a matter of law.[4]

### III.    CONCLUSION

Accordingly, for the reasons stated herein, **IT IS ORDERED** as follows:

1.    Defendants' Motion for Summary Judgment (Doc. #93) is hereby **GRANTED**;

2.    Plaintiff's Motion for Partial Summary Judgment (Doc. #91) is hereby **DENIED AS MOOT**;

3.    This matter is hereby **STRICKEN** from the docket of the Court; and

4.    A Judgment in favor of Defendants will be entered contemporaneously herewith.

---

[4] Having determined that all of Plaitiff's claims are time-barred by the applicable statutes of limitations, the Court need not address her argument that she is entitled to partial summary judgment on her fraud and conversion claims.  Accordingly, Plaintiff's Motion for Partial Summary Judgment (Doc. #91) is **denied as moot**.

This 22nd day of December, 2009.



**Signed By:**

**_David L. Bunning_**   *DB*

**United States District Judge**

G:\DATA\Opinions\0-07-27-MSJ.wpd